**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 96-3814

| | | |
|---|---|---|
| Iris M. Summit, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| S-B Power Tool, (Skil Corporation), a | * | |
| Division of Emerson Electric Company, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 22, 1997
Filed: August 13, 1997

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

Iris Summit appeals the district court's[1] entry of judgment notwithstanding the verdict for S-B Power Tool (the Company) in this constructive discharge action. On appeal, Summit argues that: (1) because there was substantial evidence to support the jury's verdict, the district court erred by granting a judgment as a matter

_____

[1]The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

of law; (2) the

district court erred in limiting the evidence that Summit could present; and (3) the district court erred in failing to instruct the jury on punitive damages. We affirm.

## I.

Summit, a 54-year-old woman, worked for the Company for nineteen years before resigning on October 28, 1994. Immediately prior to her resignation, Summit held the position of line supervisor on the second shift.

In December 1993 or January 1994, Human Resources Manager Donna Meyer first heard complaints regarding favoritism in the assignment of overtime by Summit. Although there had been an employee survey done about six months earlier that indicated no problems with Summit's performance, three employees complained to and were questioned by Meyer. After consulting with the plant manager, Randy Guthrie, the employees on Summit's line were interviewed. Over half of the employees indicated that they were having problems with Summit because of the way overtime was distributed, because of favoritism, or because of lack of communication.

Summit's direct supervisor, Frank Saterfeil, was then told of the complaints. Together, Meyer and Saterfeil prepared an issues and objectives sheet to inform Summit of the problems and to give her recommendations for improvement. On March 11, 1994, Meyer and Saterfeil met with Summit to discuss Summit's performance and give her their recommendations. Summit claims that she was only following Saterfeil's orders by assigning overtime to

people who knew how to do the work and that Saterfeil told her to continue to schedule overtime "like we've always done the overtime." Trial Tr. at 20 (testimony of Iris Summit).

In April 1994, Summit's regular performance review was due. Saterfeil prepared Summit's review and sent it to Guthrie for his signature. Based on this review, Summit was to receive an increase in pay. However, Guthrie chose to postpone her review and

raise for three months because of the problems she was having. See id. at 110. Following the delay, in July, the Company believed Summit had shown improvement and gave her the review along with a retroactive pay increase. Id. at 126, 140, 152.

For its busy season, the Company typically hires temporary employees and adds additional lines on a second shift. In June 1994, Summit was temporarily transferred to the second shift to supervise a line of temporary employees. Due to their high turnover rate, the temporary employees were more difficult to manage.

When Saterfeil approached Summit about the transfer, he told her, "'I'm moving you to second shift. You are going to have to take care of the Moto tool lines and accessories.'" Id. at 21 (testimony of Iris Summit). When Summit told Saterfeil that she "didn't want nothing to do with that," id. at 22, Saterfeil responded, "'I need you to go to it.'" Id. Regarding the motive for Summit's transfer, Guthrie, Meyer, and Saterfeil stated that, after considering Summit's problems with the employees she currently supervised, they wanted to give Summit a fresh chance to interact with a new set of employees. Id. at 111-12, 139, 154-55. However, Summit claims Saterfeil explained her assignment to second shift by stating, "'I'm going to give you a break. . . . Usually, I don't send a woman to do a man's job. I want you to know this is a break for you.'" Id. at 30-31 (testimony of Iris Summit); but see id. at 144 (Saterfeil testifying that he made no such statement). Also in June 1994, David Hoffman, a younger male employee with less experience, was promoted to the

position of temporary unit manager of the second shift and Summit's immediate supervisor. According to the Company, Hoffman was selected for the position over Summit because he received better performance ratings and because Summit had received a performance warning in March. See id. at 114 (testimony of Donna Meyer). However, Summit claims that Saterfeil explained Hoffman's supervisory position over Summit by saying, "'[w]e've got to have somebody on [the line] to watch you women. We can't leave you women out there. No telling

what y'all would do if there wasn't a man to watch over you.'" Id. at 30; but see id. at 144 (Saterfeil testifying that he made no such statement).

On August 11, 1994, Summit received a written performance warning. This warning was based on a memorandum written by Hoffman to Saterfeil. Hoffman complained that, after the decision was made to shut down one of the lines due to quality problems, he asked Summit to explain to her employees why the line was being shut down and why they were being sent home, but Summit failed to do so. Furthermore, Hoffman stated that other employees had left work because Summit failed to notify them that they were required to work late. Hoffman concluded that Summit had a problem communicating with employees on an individual basis. Following discussions between Meyer, Hoffman, and Saterfeil, a written warning was given to Summit by Saterfeil. The warning stated that Summit had sixty days to "correct [the] problems or further disciplinary action may be taken that could lead to termination." Appellee's App. at 42.

After the August warning, no formal disciplinary action was ever taken against Summit, and the sixty-day time period came and went. Trial Tr. at 64 (testimony of Iris Summit). However, Summit claims that both Saterfeil and Hoffman told her that she was going to be fired. Id. at 31, 64; but see id. at 78 (testimony of David Hoffman), 134 (same); 142 (testimony of Frank Saterfeil). Summit's frustration with supervising an assembly line of temporary employees and her fear of being fired resulted in her not being able to sleep and her stomach hurting continuously. In late August, Summit's physician gave

her medication for the anxiety and Summit took a week of medical leave.  When Summit returned, "[a]ll the people were real glad to see [her]. . . . And David Hoffman said that he didn't realize how much that [she] had actually done. . . . [H]e was really glad to see [her] back."  Id. at 32 (testimony of Iris Summit).

Summit also claimed that, "while all this was going on," the following interchange occurred between herself and Saterfeil:

[O]ne day he asked me, "How come Donna [Meyer] don't like you?" And I said, "I don't know. I didn't know she didn't." And he said, "Well, she is doing some weeding. Maybe she is just weeding out the old ones." I said, "Well, then, that means you will be going with me; right?" And he said, "Well, I should have said 'weeding out the old women.'"

Id. at 42; but see id. at 144 (testimony of Frank Saterfeil).

On October 17, 1994, Summit quit her job. The Company asserts that, when she resigned, Summit stated she was leaving to return to the nursing profession and pursue her certification as a registered nurse (RN). Id. at 117 (testimony of Donna Meyer), 133 (testimony of David Hoffman), 142 (testimony of Frank Saterfeil). However, at trial Summit claimed that she had never told anybody that her reason for resigning was to go back to nursing. Id. at 61, see also id. at 33, 37. One month after she resigned, Summit began working as a licenced practical nurse (LPN). On her application for this position, Summit stated her reason for leaving the Company as "'[r]eturn to nursing.'" Id. at 62, 171. When she left the Company, Summit was receiving $15.21 per hour. Her starting pay as an LPN was $7.25 per hour.

On February 15, 1995, Summit filed a charge of sex and age discrimination against the Company with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a right to sue letter and Summit filed suit on December 21, 1995. Summit brought her action pursuant to both the Age Discrimination in Employment Act of 1967, 29

U.S.C. §§ 621-634 (1994) (ADEA), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (1994) (Title VII).

Before trial the Company made a motion in limine requesting the district court to enter an order to prevent mention of alleged discriminatory events for which Summit had not filed a timely charge of discrimination with the EEOC. The Company argued that:

A plaintiff who claims discrimination must file a charge of discrimination "within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ." 42 U.S.C. § 2000e-5(e)(1). [Summit] filed her EEOC charge on February 15, 1995, thus any acts occurring before August 15, 1994 are not actionable.

Def.'s Br. in Supp. of its Mot. in Limine at 6-7. Thus, the Company sought to exclude any reference to Summit's alleged sexual harassment by Saterfeil in 1988, Summit's temporary transfer to the second shift in July 1994, Summit's non-promotion to the temporary position of Unit Manger in July 1994, and the disciplinary actions taken against Summit on March 8, 1994, and August 11, 1994. In reference to the alleged sexual harassment in 1988, the Company also noted that Summit's EEOC charge did not include, as a basis for discrimination, retaliation for her contemporaneous reporting of the alleged harassment to the Company. Id. at 5.

Summit responded to the Company's motion in limine by arguing that:

Although [Summit] may not be able to obtain relief for those discriminatory acts which occurred outside of the window of the EEOC charge, it has long been held that other acts of discrimination outside of the charge period are properly admissible as general background information that is relevant in deciding whether or not the acts complained about during the charge period are more likely to have occurred than not.

-11-

Pl.'s Br. in Supp. of Her Resp. to Def.'s Motion in Limine at 2.

At trial, the district court allowed as background the presentation of evidence regarding events occurring before August 15, 1994, more than 180 days before the EEOC claim was filed. Specifically, the district court allowed testimony regarding Summit's transfer to the second shift in July 1994, Summit's non-promotion in July 1994, and both disciplinary actions taken against Summit on March 8, 1994, and

August 11, 1994.  However, the district court would not allow Summit to present evidence of sexual harassment that allegedly occurred in 1988.  The district court held that "it is too remote.  In 1988, that is going back six years from these events that the complaint was made about.  It seems to me that would just not be relevant." Trial Tr. at 39.  The proffered testimony related to Saterfeil's attempt to get Summit to date him.  Summit's counsel stated that:

> The plaintiff would testify that Mr. Saterfeil approached her, Mrs. Summit, and tried to get her to date him or go out with him.  He was married at the time and she refused his advances and complained to her supervisors about that. And she and Mr. Saterfeil both were counseled at that time.  And she would testify his attitude toward her then changed from one of approaching her in a social nature to one of harassment which continued on up through the filing of these charges.

Id. at 39-40.  Summit also wanted to call Merle Young, a former Human Resources Manager for the Company.  Summit's counsel proffered that:

> Mr. Young would also testify he is aware of some opinions of the defendant which reflected Mr. Saterfeil had employee relation problems, that Mr. Saterfeil was counseled because of that, and he would testify Mr. Saterfeil caused undue stress on Mrs. Summit because of the way he would discipline her in front of other employees, and that this was carried on up until [Young's] tenure ended in 1993.

Id. at 41.

-13-

At the close of the case, the district court also denied Summit a punitive damages instruction.  The jury returned a verdict in favor of Summit on her Title VII claim and for the Company on the ADEA claim.  The jury found that Summit had been constructively discharged on the basis of sex, but not on the basis of age.

The district court then entered judgment for the Company notwithstanding the verdict. The district court held that substantial evidence did not support the verdict. The district court found that Summit had resigned her position to re-enter the health care profession and that the only evidence to the contrary was Summit's own conclusory statements. The district court's order relied solely on this Court's ruling in Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490 (8th Cir. 1996). Summit appeals.

**II.**

Notwithstanding Summit's argument to the contrary, the district court properly granted the Company judgment as a matter of law because there was not substantial evidence to support the jury's verdict. Summit summarizes the evidence by first noting that she was a nineteen-year veteran employee who had never received a written reprimand before March 1994. Furthermore, she presented evidence of

> [(1)] her transfer to the second shift where she had the responsibility of supervising 46 temporary employees with only two regular employees to help train [and] given defective parts from vendors to use in the assembly of the items built on her line by the temporaries[; (2)] the stress on her because she was unable to make production, stress from the two previous reprimands and the threat of discharge, and the stress and frustration from having an inferior employee, David Hoffman, with less experience and seniority, promoted to a position immediately over her [and] that David Hoffman's position of temporary unit manager, supervising

-15-

Summit, only existed for approximately one month past Summit's resignation[; and (3) the fact] that sixty (60%) percent of the menial positions on the line [are] filled by women as compared to twenty-seven (27%) percent of supervisory positions being filled by women.

Appellant's Br. at 27-28. Summit argues that she was the victim of sexual harassment, that sexual harassment created a hostile work environment, and that the hostile

environment supports the jury verdict that she was constructively discharged.[2] We disagree.

In reviewing a judgment as a matter of law, this Court uses the same standard as the district court:

> In a motion for [a judgment as a matter of law], the question is a legal one, whether there is sufficient evidence to support a jury verdict. This court must analyze the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility. We have also stated that to sustain a motion for [a judgment as a matter of law], all the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party.

White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)

---

[2]On appeal, the Company objects to Summit's argument regarding sexual harassment and hostile work environment because only a constructive discharge claim went to the jury. The Company notes Summit's failure to object when the jury instructions did not contain instructions on sexual harassment or on hostile work environment. See Verdict Form, reprinted in Appellant's App. at Tab U; Jury Instructions, reprinted in Appellant's App. at Tab V (No. 1, 7, 9, 13). Because only a claim of constructive discharge went to the jury, we will consider no other claims on appeal. See Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 295 (3d Cir. 1991) (holding that reviewing court would not consider an issue raised on appeal but not considered by jury at trial); Lambur v. Yates, 148 F.2d 137, 138 (8th Cir. 1945) ("Ordinarily under these circumstances an appellate court will refuse to review the judgment of a trial court entered upon the verdict of a jury. On appeal the parties are usually restricted to the theory on which the cause was tried in the lower court." (citations omitted)).

(footnote and citations omitted); see also Jarvis v. Sauer Sundstrand Co., 116 F.3d 321, 324 (8th Cir. 1997).

The evidence Summit presented does not support a finding of constructive discharge. This Court has articulated the standard for constructive discharge as follows:

> To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit. The plaintiff can satisfy the intent requirement by demonstrating that he quit as a reasonably foreseeable consequence of the employer's discriminatory actions.

> <u>A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable.</u> To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.

<u>Tidwell</u>, 93 F.3d at 494 (citations omitted) (emphasis added).

At bottom, Summit's evidence does not establish that the Company acted with the intention of forcing Summit to resign or that a reasonable person would have found her conditions of employment intolerable. First, her transfer to the second shift, complete with temporary employees and defective parts, is indistinguishable from <u>Tidwell</u>. In <u>Tidwell</u>, the plaintiff's work assignment was changed and no constructive discharge was found. <u>Id.</u> at 496 ("Dissatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a

-19-

basis for constructive discharge." (citing <u>Carter v. Ball</u>, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."))).

Second, Summit's stress--caused by her inability to improve productivity, two previous reprimands, having a less experienced employee promoted to a position immediately over her, and the threat of discharge--does not automatically translate into constructive discharge. There is no evidence that sex discrimination, rather than performance problems, prompted the reprimands. Furthermore, Hoffman's promotion over Summit does not constitute constructive discharge. Simply put, merely because Summit "lost a single promotion opportunity to an arguably better qualified candidate, the overwhelming compulsion to quit that is necessary for constructive discharge [was] not created." Tidwell, 93 F.3d at 495.

This Court has not directly ruled on whether the mere threat of being discharged for cause would lead a reasonable person to find his or her conditions of employment intolerable. We hold that an employee's being told that he or she will be fired for cause does not, in and of itself, constitute constructive discharge. See Hill v. St. Louis Univ., 923 F. Supp. 1199, 1209 (E.D. Mo. 1996) ("The only basis for [plaintiff's] claim of constructive discharge is that on December 1, 1993 she was told that unless she resigned, she would be terminated. Plaintiff offers no legal support for her contention that notice of termination and choosing to resign instead is a 'constructive discharge'. It is clear that it was not her working conditions that 'forced' plaintiff to resign, but rather being informed that she was being terminated from her employment. Consequently, merely being informed of termination cannot constitute a 'constructive discharge'."); but cf. Downey

<u>v. Southern Natural Gas Co.</u>, 649 F.2d 302, 305 (5th Cir. 1981) (holding that an employee being apparently singled out and told his company had nothing for him to do and that he was in danger of being discharged and losing retirement benefits created a sufficiently contested issue of material fact to make summary judgment on the employee's age discrimination claim improper).

Third, Summit's statistical evidence creates only the weakest inference that the Company acted with the intention of forcing Summit to resign and provides no support

for a finding that a reasonable person would have found Summit's conditions of employment intolerable.

Therefore, because the jury's verdict was not supported by substantial evidence, the district court properly granted the Company's motion for judgment notwithstanding the verdict.

**III.**

Summit next argues that the district court erred in limiting the evidence that Summit could present regarding the Company's actions taken prior to the 180-day window of the EEOC charge.[3]  Citing Hawkins v. Hennepin Technical Center, 900 F.2d 153 (8th Cir. 1990) (granting new trial when, although sexual harassment was not charged, plaintiff should have been permitted to introduce additional evidence regarding specifics of such harassment), and Estes v. Dick Smith Ford, Inc., 856 F.2d 1097 (8th Cir. 1988) (holding that background evidence about defendant's work force was admissible, although plaintiff presented an individual disparate treatment case, rather than a disparate impact case), Summit notes that other acts of discrimination outside the charge period are properly admissible as general background

---

[3]We note that August 19, 1994, was 180 days prior to the date Summit filed her EEOC charge.  The only evidence that the district court excluded prior to that date related to the alleged sexual harassment in 1988.  The district court allowed Summit to introduce evidence prior to the window of the EEOC charge.  This evidence included: Summit's satisfactory employee survey done in the summer or fall of 1993; the warnings given in March and August 1994; and the transfer to second shift in June 1994.

information and are relevant in deciding whether or not the acts complained about during the charge period are more likely to have occurred than not. Specifically, Summit asserts that the district court erred by limiting Summit's presentation of evidence concerning sexual harassment by Saterfeil in 1988. We disagree.

The trial court's exclusion of evidence is entitled to substantial deference on review.  See Hawkins, 900 F.2d at 155.  The district court excluded the evidence because it was not actionable due to Summit's failure to file a timely EEOC charge, see 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ."), and because it was too remote.

Although a "blanket evidentiary exclusion" of background information would be "especially damaging in employment discrimination cases," Estes, 856 F.2d at 1103, that is not the case here.  Rather than a blanket exclusion, the district court excluded only the allegations regarding sexual harassment in 1988 and admitted the balance of Summit's background information. In fact, all of the alleged actions of the Company--the reprimands, Summit's transfer, the threats of being fired--took place 180 days prior to Summit's EEOC claim. Moreover, although the evidence that Summit was sexually harassed in 1988--six years prior to her alleged constructive discharge--may have some slight relevance in showing motive, this evidence does nothing to show that in 1994 a reasonable person would have been compelled to quit.

Lastly, the cases relied upon by Summit are distinguishable.  In Hawkins, the excluded evidence had greater relevance because that case involved a claim of discrimination and unlawful retaliation following complaints of sexual harassment, rather than a claim of constructive discharge.  See Hawkins, 900 F.2d at 153.

Similarly, in <u>Estes</u> the plaintiff was not asserting a claim of constructive discharge as he was discharged by his employer.  <u>See</u> <u>Estes</u>, 856 F.2d at 1100.

Therefore, we hold that the district court properly excluded the presentation of evidence concerning sexual harassment in 1988.

## IV.

Summit also argues that the district court erred by failing to instruct the jury on punitive damages. We disagree.

Under Title VII, punitive damages may be recovered "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (1994). Even assuming that there was sufficient evidence for a jury to conclude that the Company intentionally discriminated against Summit, there was not sufficient evidence of malice or reckless indifference to submit a punitive damages instruction to the jury.

## V.

Accordingly, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-27-